```
 1              UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS
 2
                                 Criminal No.
 3                               08-10225-WGY

 4
    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
 5                                     *
    UNITED STATES OF AMERICA           *
 6                                     *
    v.                                 *   ARRAIGNMENT and PLEA
 7                                     *
    DAMON PATRICK TOEY                  *
 8                                     *
    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
 9

10

11

12              BEFORE:  The Honorable William G. Young,
                         District Judge
13

14

15

    APPEARANCES:
16
               STEPHEN P. HEYMANN, Assistant United States
17      Attorney, 1 Courthouse Way, Suite 9200, Boston,
        Massachusetts 02210, on behalf of the Government
18

19             FEDERAL DEFENDER OFFICE (By Syrie D. Fried,
        Esq.), 408 Atlantic Avenue, Third Floor, Boston,
20      Massachusetts 02210, on behalf of the Defendant

21

22

23
                                 1 Courthouse Way
24                               Boston, Massachusetts

25                               September 11, 2008
```

1          **THE CLERK:**  Calling Criminal Action 08-10225, the

2     United States v. Damon Toey.

3          And this is a plea to an information.  Do you have

4     the waiver of indictment?

5          **MS. FRIED:**  I do.

6          **THE COURT:**  Good afternoon.  Would counsel identify

7     themselves.

8          **MR. HEYMANN:**  Your Honor, Stephen Heymann on behalf

9     of the government.

10          **MS. FRIED:**  Good afternoon, your Honor.  Syrie

11     Fried on behalf of Damon Patrick Toey.

12          **THE COURT:**  And who is present.

13          **MS. FRIED:**  Who is present.

14          **THE COURT:**  Do I understand, Ms. Fried, that Mr.

15     Toey desires to, when arraigned, plead guilty to this

16     information?

17          **MS. FRIED:**  That's correct, your Honor.

18          **THE COURT:**  He may come forward to be inquired of.

19          **THE CLERK:**  Right up here.  And, sir, would you

20     raise your right hand.

21          Do you solemnly swear that the answers you will

22     give to this Court will be the truth, the whole truth, and

23     nothing but the truth, so help you God?

24          **THE DEFENDANT:**  I do.

25          **THE CLERK:**  Please be seated.

1          **INQUIRY BY THE COURT**

2    **Q**    Could you state your full name?

3    A    Damon Patrick Toey.

4              **THE COURT:**  It won't work, Ms. Fried.

5              **MS. FRIED:**  Oh, I'm sorry.

6              **THE COURT:**  We're all electronic, but it doesn't

7    work.

8    **Q**    My name is Bill Young.  I'm the judge who presides in

9    this session of the Court.  Now, your lawyer says -- and I

10   see a plea agreement here -- that you desire to plead

11   guilty.

12   A    That's correct.

13   **Q**    Wholly apart from this plea agreement, it doesn't count

14   for anything unless you actually plead guilty, and there's

15   various things I have to find out before I can allow you to

16   plead guilty.

17             I have to find out that you know what you're doing

18   today.  I have to find out that you know what you're giving

19   up, because you give up things that are terribly important

20   if you plead guilty.  I have to find out that you know what

21   may happen to you, what you're letting yourself in for, if

22   you plead guilty.

23             I have to find out that you want to plead guilty.

24   Not that you're happy about it, but all things considered,

25   you've decided, not your family, not Ms. Fried, or anybody

1    else, you've decided that the best thing for you to do is

2    plead guilty.  And then I have to find out that the

3    government has enough evidence that if we were to go to

4    trial you could be found guilty of these various charges.

5          Now, to find these things out I ask you questions,

6    and then to see if they've got any evidence, I ask them what

7    evidence they have, and then I ask you if it's true.  If you

8    don't understand something I'm asking you, you've got to

9    stop me because I have to ask it in a way you understand.

10         Now, do you understand that?

11   A    Yes.

12   Q    Likewise, Ms. Fried's come up to stand by you.  And if

13   at any time you want to talk to her, you just turn your

14   chair and I'll step away and you can talk privately.

15   Because if you plead guilty, I'll be the judge who imposes

16   the sentence.  So you're sizing me up even as I'm asking the

17   questions.  And if for any reason, listen to the questions,

18   notwithstanding this agreement, the agreement goes away if

19   you don't plead guilty, you would rather have a trial, you

20   just say I would like to stop.  I'm not angry.  It won't

21   mess up my afternoon.  What we'll do, as I mentioned in the

22   case while you were waiting, we'll just schedule your case

23   for trial and we'll get on with it, because you are entitled

24   to a trial.

25         Now, real world, usually people who plead guilty

```
 1    get a discount on the sentence.  Reason?  You've spared the

 2    government the expense of a trial.  And if we have a trial,

 3    usually, one, I give the discount for a plea, and usually I

 4    won't if there's no plea.  But I will never, ever punish

 5    you, not one day, for going to trial.

 6              Do you understand that?

 7    A    Yes.

 8    Q    Now, the do you know what you're doing.

 9              How old are you, Mr. Toey?

10    A    Twenty-three.

11    Q    How far did you go in school?

12    A    Eighth grade.

13    Q    Have you ever been treated for a mental condition of any

14    sort?

15    A    No.

16    Q    Are you aware of any mental illness that you may have?

17    A    No.

18    Q    Taking any medication today?

19    A    No.

20    Q    Under the influence of drugs?

21    A    No.

22    Q    Under the influence of alcohol?

23    A    No.

24    Q    Do you know what you're charged with?

25    A    Yes.
```

1    **Q**    Tell me.

2    **A**    I'm charged with conspiracy, unauthorized access to

3    computer systems, access device fraud, and aggravated

4    identity theft.

5    **Q**    It looks like you've got it just right.  Let's take the

6    committing fraud in connection with computers.

7         Before you can be found guilty of that, the

8    government has got to prove that, using a computer, and

9    knowing what you were doing, you committed fraud.

10         Now, fraud is to make a statement, or fail to make

11    a statement when you're under a duty to make such a

12    statement, with the idea that somebody else rely upon that

13    statement, to get them to rely upon that statement, they do

14    rely on it, to their detriment, and relying upon the

15    statement, which is untrue, and you know it's untrue, you're

16    going to try and get them to part with money or property,

17    and they do.  That's fraud.

18         That's not enough.  This is fraud by using

19    computers.  So the Court's going to have to -- the jury

20    would have to find that you used computers, or computer, to

21    commit the fraud.  That's one charge.

22         Another charge is to commit fraud with an access

23    device, a credit card number.  So, here what's different is

24    you're using a credit card number to commit fraud.  You make

25    a statement that's untrue, which you know is untrue, with

1    the idea that someone's going to part with money or property

2    and they do and that's what you intend.

3              And then the third charge, actually the fourth

4    count, is aggravated identity theft with the sale of credit

5    card dumps.  Now, identity theft is to assume the identity

6    by any form of representation of someone else and to pose,

7    by signing or by any identifiers in our world today, that

8    you, or someone you're working with, has the identity

9    falsely of another person.

10             Conspiracy, this is specific conspiracy, and it

11   charges you with conspiracy to do all these things.  To

12   prove conspiracy the government has to prove three things.

13   They have to -- and it's different than the other charges.

14   The government has to prove that you and at least one other

15   person, it could be more, but at least one other person,

16   agreed to do something to violate the law, to do something

17   that the law forbids.  Second, the government has to prove

18   that the specific idea of the agreement was to commit one or

19   more of these crimes, commit fraud through computers, use of

20   access numbers, credit card devices, and identity theft

21   through the sale of credit card dumps.  So they have to

22   prove that specifically what you and the other person or

23   persons had in mind.  And then, third, for conspiracy, the

24   government has to prove not that it actually happened, but

25   that one of the conspirators did something to make it come

1    about.  And each of the things I've gone over, the

2    government has to prove those things beyond a reasonable

3    doubt.

4              Do you understand that?

5    A   Yes.

6    **Q**   Let's talk about your rights which you'll give up if you

7    plead guilty.

8              You have the right to a fair and an impartial trial

9    before a jury of the people.  You will have some say in who

10   sits on that jury, acting through your attorney, Ms. Fried.

11   The jury will decide, not me, whether you are not guilty or

12   guilty.

13             At the trial you have the right to confront the

14   witnesses against you, which means you sit right here in the

15   courtroom.  You can look at them.  But more than just look

16   at them, look them in the eye, your lawyer can ask them

17   questions, cross-examine them.  You can introduce evidence

18   on your own behalf.  You can testify if you want, but you

19   don't have to.  All to demonstrate that in fact there exists

20   some reasonable doubt about one or more of these charges.

21   And if there's a reasonable doubt, you cannot be convicted

22   of that charge.

23             You likewise have the right to be utterly silent.

24   Not to say a thing, not to have your attorney say a thing or

25   make any arguments or call any witnesses.  To the extent

1    that you are silent, I will remind the jury that you are an

2    innocent person.  You didn't ask to be charged here.  The

3    government made the charges.  The government has to prove

4    the charges beyond a reasonable doubt.  No explanation is

5    required of you.

6           And lastly, and equally important, I'm going to

7    tell the jury you're innocent.  You're going to start the

8    trial innocent.  And that same belief I must follow.  I see

9    you here saying you want to plead guilty.  But we've never

10   met.  And I must take you as an innocent person, and I do.

11   And when I explain these things, I'm not giving you a thing;

12   these things are yours, they're your rights.

13          Do you understand that?

14   A   Yes.

15   Q   Plead guilty, you give them all away.  We'll never have

16   a trial.  We'll never see any of the evidence against you.

17   The closest we'll come, we'll ask the government what it

18   hopes it can put in evidence against you.

19          Your right to be silent about these matters, once I

20   sentence you, not today, but once I sentence you and it's

21   over, your right to be silent is gone as to these crimes,

22   these specific crimes.

23          Now, one of them is conspiracy.  That means that

24   somebody else, or more than one person, if other person is

25   involved, they can put you before a grand jury, they can

```
1   call you as a witness, once I've sentenced you.

2           Do you understand those things?

3   A   Yes.

4   Q   Likewise, you plead guilty when you're arraigned on this

5   information, and then you're guilty in my eyes and the only

6   thing that remains is what sentence I'm going to impose upon

7   you.

8           Do you understand?

9   A   Yes.

10  Q   Now, the government is proceeding against you here by

11  way of something called an information.  And that's

12  perfectly appropriate if you agree, because the government

13  without your agreement would have to indict you.

14          Now, I see -- is this a waiver of indictment?  Did

15  you sign this?

16  A   Yes, I did.

17  Q   Talk it all over with Ms. Fried?

18  A   Yes.

19  Q   Do you think you understand it?

20  A   I do.

21  Q   Let me take just a few minutes.

22          Unless you agree that this information is the

23  vehicle that we're going to consider here in court, the

24  charge, they can't come after you in court unless they

25  indict you.  And that means they have to go first to a grand
```

1    jury.

2           Now, a grand jury is a grand jury of the people.

3    It's secret.  You can't be there.  Ms. Fried can't be there.

4    The grand jury hears only one side, they hear the

5    government's side, and they vote only by majority vote and

6    they vote not whether you're guilty or not, but simply is

7    there probable cause to believe that you are guilty.

8           The advantage of making them indict you is, if for

9    some reason the grand jury did not indict you, returned what

10   we call a no bill, the government can't come after you on

11   these charges.  They've once put it before a jury, a grand

12   jury.  If that grand jury says don't indict him it's over.

13          Now, by waiving indictment, by giving up the

14   indictment, you are agreeing that the vehicle by which they

15   come after you, prosecute you, is this document we call an

16   information.

17          Do you waive the indictment and give it up?

18   A   Yes.

19          **THE COURT:**  All right.  I find that Mr. Damon

20   Patrick Toey knowingly, intelligently and voluntarily

21   exercises his right to waive the indictment.

22   **Q**   One other point while we're talking about your rights.

23   Back in the days when people couldn't read, or not many

24   people could read, it was a requirement, because this is

25   your first appearance here, it was a requirement that to

1    arraign someone we would read the charge out in open court

2    so everyone could listen to it, especially the person

3    accused could listen to precisely what the government was

4    charging.  You can give that up as well.

5           So let me ask you.  Have you read the information

6    in this case?

7    A    Yes, I have.

8    Q    Talked it all over with Ms. Fried?

9    A    Yes.

10   Q    Do you think you understand it?

11   A    I do.

12   Q    When we come to that point in the proceeding, do you

13   want the clerk to read the information here in open court?

14   A    No.

15   Q    All right.  Now, let's talk about what may happen to

16   you.

17          When congress passes a law they pass a maximum

18   possible penalty.  There are times when people get the

19   maximum penalty, but usually, because congress has passed

20   another law, called the sentencing guidelines, which advises

21   judges how to sentence, not too many people get the maximum

22   penalty and in some instances it might be unconstitutional

23   to impose the maximum penalty.  But we'll start with that.

24          For each of these violations, well, not for each,

25   but for the --

1              **MS. FRIED:**  Your Honor, I have my belief about what

2     the statutory maximums are on the various charges.

3              **THE COURT:**  Well, I mean, I've got a signed plea

4     agreement here, so I assume that I can read it.  But my

5     problem is there's an alleged violation of 18 United States

6     Code, Section 371, and I don't see that here listed in the

7     charges that I have gone over.  I see a violation of

8     Section 1030, 1029, 1028A.  So I suppose 371 is the

9     conspiracy.  All right.

10             **MR. HEYMANN:**  Yes, your Honor.

11             **THE COURT:**  Fine.

12             **THE CLERK:**  Do you want the indictment?

13             **THE COURT:**  No, I have it.  I now understand.

14             **THE CLERK:**  I mean the information, not the

15    indictment.

16             **THE COURT:**  Thank you.

17    **Q**   If you're guilty of conspiracy, the statutory maximum,

18    we call it, is five years in prison, three years of

19    supervised release, a $250,000 fine.

20             For violation of fraud by use of computer, the

21    maximum is ten years, three years of supervised release,

22    $250,000 fine.

23             Violation of fraud using these credit card numbers,

24    the maximum statutory penalty is 15 years, three years of

25    supervised release, and a $250,000 fine.

1          But aggravated identity theft, that's a little

2     different.  That has a mandatory term of two years -- I

3     haven't got any choice on that -- on and after whatever else

4     I sentence you to.  Whatever else the sentence is then

5     you've got to have two years more on top of that.  And then

6     it's up to me about supervised release, but I can give you

7     up to three years, and up to a $250,000 fine, and forfeiture

8     of all the property derived from the fraudulent activity and

9     the conspiracy.

10          Now, do you understand those are the statutory

11     maximums, and for aggravated identity theft, the minimum?

12     A    Yes.

13     Q    So we're going to start out with two years, absolute

14     minimum.

15               MS. FRIED:  Your Honor?

16               THE COURT:  Yes.

17               MS. FRIED:  Could I just interrupt the proceedings

18     for a moment so I could have a little consultation with --

19               THE COURT:  You can; you go right ahead.

20               MS. FRIED:  -- Mr. Heymann for just a minute.

21               MR. HEYMANN:  And, your Honor, if I may, simply

22     while we are at this break, the plea agreement includes a

23     waiver of appeal in paragraph 6 and an agreement to forfeit

24     in paragraph 10, and the Court may wish to inquire of the --

25

1          THE COURT:  I do, and thank you.

2          MR. HEYMANN:  Okay.

3          (Whereupon counsel conferred.)

4          THE COURT:  All right, Ms. Fried?

5          MS. FRIED:  Almost.  I'm sorry.  It has to do with

6     putting the correct statutory maximums on the record, your

7     Honor.

8          THE COURT:  Well, that's a matter of the most

9     marginal significance because it's highly unlikely that we

10    will approach any of the statutory maximums in this

11    quasi-determinant sentencing system we have.

12         MR. HEYMANN:  Your Honor, the issue arises -- let

13    me take it in two steps, if I can.

14         Counsel is raising a question, and it's hard for me

15    to flow through a complex statute on the fly with, candidly,

16    as to whether or not in the instance of 1030(a)(2)(C) it

17    should be a five year maximum rather than a ten year maximum

18    as reflected in the plea agreement and whether with respect

19    to 1029(a)(3) it ought to be a ten year maximum instead of a

20    five year -- instead of a 15 year maximum.

21         THE COURT:  I consider the matter peripheral at

22    best, because what's going to drive the sentence here is the

23    individual facts pertaining to this offender, the advice

24    from the sentencing commission, capped by the, what I

25    consider the highest constitutionally reasonable sentence.

1          Now, I suppose you've talked these things through.

2    So, why don't we go on without resolving that, and if

3    there's anything, Ms. Fried, to protect your client, if

4    there's anything that would affect Mr. Toey in any

5    substantive way, I'll see to it he's not prejudiced.

6          **MS. FRIED:**  I just wanted to do that because I do

7    think that there's a discrepancy between my calculations of

8    the statutory maximums to what they're reflected in the plea

9    agreement.

10         **THE COURT:**  That's all in my judgment peripheral.

11   Now, let's --

12         **MS. FRIED:**  All right.

13         **THE COURT:**  -- get to things that make a difference

14   here.

15         I'm not given a proposed sentencing guidelines

16   calculus, but I need one.  So, Mr. Heymann, why don't I turn

17   to you.

18         Putting aside any deductions, any deductions, how

19   do you calculate the sentencing guidelines here?

20         **MR. HEYMANN:**  And if I may simply state for the

21   record, your Honor, if indeed there is an error in the

22   numbers that are contained in the plea agreement, they are,

23   the numbers according to what counsel's just shown me would

24   be lower than the Court has just advised the defendant of,

25   not higher.  So if anything, his exposure is less, not

1    greater, than he's already been advised of.

2            **THE COURT:**  Thank you.

3            **MR. HEYMANN:**  Your Honor, this is a quite

4    exceptional circumstance for the Court and I think the

5    courthouse in general because the guidelines as I'm about to

6    take the Court through in fact are a life sentence which

7    means that the guidelines exceed those of the maximum

8    sentences, however, they are statutorily pegged and required

9    for the defendant.

10           They start -- should I take the Court through the

11   analysis or just through the ultimate numbers?

12           **THE COURT:**  Just do the calculus, yes.

13           **MR. HEYMANN:**  It starts off with an offense level

14   of seven under 2B1.1(a).  The loss figure is extraordinary,

15   that's what drives the guidelines here.  Because the loss

16   figure exceeds $400 million, it adds 30 levels.  It's a

17   combination here of Application Note 2B1.1(F)(1) and the

18   fact that over 40 million distinct credit and debit cards

19   were involved.  It's also driven by the loss of one of the

20   locations that were, two of the locations really that were

21   hacked into and from which credit and debit cards were

22   stolen during the course of the conspiracy to which the

23   defendant is pleading guilty.

24           It then adds six levels pursuant to 2B1.1(2)(C)

25   because there are over, the ultimate victims in this case,

1    typically the banks, for whom the loss is carried through,

2    and there are, in our current estimation, over 250 of those.

3    An increase of two levels because the offense involved

4    stolen property and the defendant was a person, a business

5    of receiving and selling stolen property.  That's subpart

6    (4).  Under subpart (9), the offense involved sophisticated

7    means.  That increases it by an additional two levels.

8            With respect to -- because it involved unauthorized

9    access devices, it increases it an additional two levels

10   under subpart (10).

11           And finally, under 3B1.3, the use of special skills

12   in a manner that facilitated the commission and concealment

13   of the offense increases it by two levels.

14           The combination of that series of additions to the

15   base offense level puts it very well above the high end of

16   the guidelines table and therefore creates a guidelines

17   level of life.

18           **THE COURT:**  Even with a criminal history category

19   of I?

20           **MR. HEYMANN:**  Even with a criminal history category

21   of I.

22           **THE COURT:**  Thank you.

23   **Q**   Did you hear what Mr. Heymann had to say?

24   **A**   Yes.

25   **Q**   What he had to say makes some of the things that I've

1    just said completely beside the point.  Because the way the

2    congress through the sentencing commission is advising me,

3    if that were all I was looking at, I could give you a

4    sentence up to life imprisonment, but of course I may not.

5    Because each of these separate offenses has a statutory

6    maximum.  And the most I could do is go to the statutory

7    maximums and then make one run after the other.  So, it does

8    make a difference whether the statutory maximum is ten years

9    for a particular offense or five years.

10            **MS. FRIED:**  Your Honor?

11   **Q**    If we, if we go with what's here in the plea agreement,

12   I could theoretically, I'm not saying I would, but I could

13   theoretically add up five years for conspiracy, ten years

14   for the fraud by computer, another 15 years for the access

15   codes, and that takes us to 30 years.  Plus, I have to add

16   two years for aggravated identity theft.  That gets us to 32

17   years.  Those are the statutory maxima.  Though, given the

18   fact your counsel has raised a problem with it, the way to

19   say it to you is, it's a legal issue that's complex.  If

20   she's right, it may be lower than that.  But whatever those

21   statutory maxima are, no judge, including me, could go

22   higher than the statutory maxima adding one consecutively

23   after the other.

24            Do you understand that?

25   **A**    I understand.

1    **Q**   And I could do the same thing with the fines, and I must

2    add up the special assessments of 100 or $200.

3           Now, since there's a plea agreement, let's go over

4    that agreement.

5           First, take a look at it.  Did you sign the plea

6    agreement?  Look at the last page.

7           **MS. FRIED:**  Do you need your copy?

8           **THE DEFENDANT:**  Yes, please.

9    **Q**   Is that your signature on the last page there?

10   **A**   Yes.

11   **Q**   Did you talk this all over with Ms. Fried before you

12   signed it?

13   **A**   Yes.

14   **Q**   Did you read it?

15   **A**   Yes.

16   **Q**   Do you believe you understand it?

17   **A**   Yes.

18   **Q**   Now, let's look at a few parts of this.  I want you to

19   look specifically at -- I'm going to skip, I'm going to come

20   back to this sentence recommendation here, but I want you to

21   look at paragraph 6.

22          Do you see here that it says that's a waiver of

23   your right, you're giving up your right to appeal if I

24   follow the terms of this plea agreement and to collaterally

25   challenge it, like bring a petition for writ of habeas

1      corpus.

2              Do you see that?

3      A   Yes.

4      Q   Now, I have to tell you, I'm not so sure that legally

5      they can impose that.  But it's here.  And you've signed it.

6      And you can be sure that if I, if I follow the plea

7      agreement and I sentence you lawfully and you try to appeal,

8      or bring a petition for habeas corpus, they're going to be

9      right in here telling me, or telling some higher court, that

10     you don't have any right to do that.  And then, at that

11     time, either I or the higher court's going to have to figure

12     out whether they can.  I have problems with it, but it says

13     it here, and I must take that into account.

14             Do you want to talk to Ms. Fried?

15     A   Please.

16     Q   Sure.

17             (Whereupon Ms. Fried and Mr. Toey conferred.)

18     Q   Had enough time to talk to Ms. Fried?

19     A   Yes.

20     Q   Any questions you want to ask me?

21     A   No.

22     Q   Look over here at paragraph 7, it says other

23     post-sentence events.  Now, they think now that you're

24     criminal history category I, but when the probation office

25     investigates it if you're a higher criminal history, or if I

22

1   were to calculate the wrong criminal history, this says on

2   resentencing you give up the right to challenge that.  I

3   don't think they have the right to put that in there either,

4   and I'm telling you that.  But it's here.  And if there's

5   any resentencing to be done, if you plead guilty, I'm not

6   going to do it.  It will be before some other judge.  So

7   some other judge, not me, who may really think this is fine,

8   is going to have to sort that out.

9            Do you understand that?

10  A    Yes.

11  Q    Now, look at paragraphs -- paragraph 8, especially over

12  here on page 7, paragraph 8B.  That sets forth the situation

13  where the government might recommend a lenient sentence.

14            Do you understand that?

15  A    Yes.

16  Q    Do you know that's not, that it's up to them whether to

17  make such a recommendation?

18  A    Yes.

19  Q    It's not up to -- I mean, ultimately I will decide what

20  the sentence is.  But I can't invoke this section of the

21  sentencing guidelines on my own.  I'll listen to everything

22  that anyone tells me.  But it's up to them to make this

23  motion that's referred to here in paragraph 8.

24            Do you understand that?

25  A    Yes.

1  **Q**   Now, look over here on paragraph 9 on page 8.  You see

2  that I'm not bargaining with you in any way.  I'll impose

3  the sentence that is appropriate under the law.  I'll listen

4  to the lawyers.  I'll listen to you.  I'll listen to my

5  probation officer.  But I will impose the sentence

6  appropriate under the law.

7              Do you understand?

8  A   Yes.

9  **Q**   Paragraph 10, forfeiture.  This, this sets forth all

10  those money and property that they may well go after in this

11  case, and by pleading guilty then there's no doubt that the

12  matters can be forfeited insofar as they are yours and under

13  your control.

14              Do you understand that?

15  A   Yes.

16  **Q**   Now, let's go back to the sentence recommendation which

17  is found here in paragraph 3.  As far as this goes, the

18  government isn't going to make a recommendation.

19              Is that how you understand it?

20  A   Yes.

21  **Q**   Now, you reserve the right, you have --

22              **THE COURT:**  That's not so?

23              **MS. FRIED:**  Well, I think the understanding is that

24  we haven't agreed in advance about what the recommendation

25  is going to be.  I would characterize it more that way.  We

```
 1   don't have --

 2              THE COURT:  Oh, as of today?

 3              MS. FRIED:  That's right.  I mean, not that they're

 4   not going to make a recommendation, but we do not have an

 5   agreement about what the recommendation is.

 6              MR. HEYMANN:  Yes, your Honor, that is the case.

 7   We don't have a recommendation as of today or agreement as

 8   of today, but we will be making a recommendation at the time

 9   of sentencing.

10   Q    The lawyers say it better than I.  But, you know, if you

11   plead guilty, you're pleading guilty today, so you know if

12   you're pleading guilty, before you know what the lawyers are

13   going to be saying to me, though it is clear in here your

14   lawyer has the right to argue to me on your behalf that I go

15   below what the sentencing guidelines advise.

16              And you understand that?

17   A    Yes.

18   Q    So, while we're going to hear a recommendation for the

19   government, we don't know what it is today.

20              Do you understand?

21   A    Yes.

22   Q    So, I just want you to be clear.  It looks like when I

23   look at all the data I have today, theoretically, I could

24   sentence you to the statutory maximum on each of these

25   offenses and add each one, four of them, one on top of the
```

1    other to the statutory maximum.

2              Do you understand that?

3    A   Yes.

4    Q   And at a minimum, the very least I could do, I have to

5    send you to prison for two years.

6              Do you understand that?

7    A   Yes.

8    Q   Now, other than this agreement that you've made with the

9    government has anybody promised you anything to get you to

10   plead guilty?

11   A   No.

12   Q   Has anyone threatened you with anything to get you to

13   plead guilty?

14   A   No.

15   Q   Are you covering up for someone else by pleading guilty

16   yourself?

17   A   No.

18   Q   Do you know if you're not a citizen of the United

19   States, conviction of this crime may have the consequence of

20   your being deported from the United States, denied admission

21   under the laws of the United States, denied naturalization

22   under the laws of the United States.

23              Do you know that?

24   A   Yes.

25   Q   Have you had enough time to talk all this over with Ms.

1    Fried?

2    A   Yes.

3    Q   Do you think she's been a good lawyer for you, gotten

4    for you those things which are your rights under the law?

5    A   She has.

6    Q   Satisfied with her representation of you?

7    A   Yes.

8    Q   Still want to plead guilty?

9    A   Yes.

10   Q   Why?

11   A   Why?  Ah, they have enough evidence other than what I'm

12   pleading guilty to that would make it a lot worse in my

13   opinion.

14   Q   All right.

15         **MS. FRIED:**  Your Honor, may I add something before

16   the Court accepts the plea, and it goes back to this

17   guidelines issue.

18         **THE COURT:**  You may.

19         **MS. FRIED:**  And what I wanted to say is that

20   Mr. Heymann in his allocution set forth some of the

21   pertinent enhancements in terms of the categories of what

22   the enhancements are.  I simply want the Court to know that

23   Mr. Toey isn't necessarily agreeing, for example, that the

24   loss figure here is in fact going to be in excess of $400

25   million.  The reason -- and I -- and Mr. Heymann understands

1    that at this, at this juncture, right here at this guilty

2    plea hearing, I don't want there to be a misimpression that

3    we have somehow acquiesced or adopted that.  It's still very

4    early in this litigation.  We know that this is a factor, we

5    know that this is the government's estimate of it.  I just

6    want --

7          THE COURT:  But you know, you know, and the

8    matter's very serious to me --

9          MS. FRIED:  Yes.

10         THE COURT:  -- that I'll give him a jury trial

11   which will include the loss figure and the government's

12   going to have to prove it beyond a reasonable doubt on

13   evidence to a jury.  So, when we get up, start leaping up

14   here all the way to a life sentence, I'm going to be

15   listening to Mr. Heymann and then turn to you, Mr. Toey, and

16   say is that true.  And if it's not true, you're going to

17   have to take exception at that time.  And one of those

18   things is the loss figure.  So, while of course the matter

19   can be argued at the time of sentence, unless he wants a

20   trial here, he's agreeing that it's in that category.

21   That's how I approach it.

22         MS. FRIED:  I just --

23         THE COURT:  For a voluntary plea.

24         MS. FRIED:  Well, I guess what I wanted to say,

25   your Honor, is that, and Mr. Heymann will correct me if I'm

1    wrong, at the time of sentencing in this case should there

2    be a material disagreement between the defense and the

3    government about, really what we're talking about is the

4    loss figure and whether it is --

5         THE COURT:  Yes.

6         MS. FRIED:  -- actually at this maximum level --

7         THE COURT:  Right.

8         MS. FRIED:  -- for guidelines purposes, it is our,

9    it is our, I will say agreement, although it's not reduced

10   to writing, that we would have a nontrial hearing before

11   you.

12        THE COURT:  In the usual course of sentencing.

13        MS. FRIED:  In the usual course of sentencing under

14   traditional sentencing guidelines practice.

15        THE COURT:  I can explain that.  Let me explain

16   that to him, and thank you for saying it.

17        MS. FRIED:  All right.

18   Q   The reason she talks is to help you, represent you.  I

19   don't mean to be glib, but she's reminding me of something.

20        I have these sentencing guidelines.  And they're

21   only advisory, but I take them very seriously.  And these

22   guidelines have different elements than what you and I

23   talked about in order to find out whether you are guilty or

24   not guilty of the specific crimes.

25        And one of the elements is what the loss was, how

1  much the loss was.  And Mr. Heymann says, well, it's over

2  $400 million.  And that's what takes us up to a potential,

3  it can't be life, but it could be up to 32 years.

4         Now, in this session of the Court, and I want you

5  to understand this, you don't have to agree to that today.

6  And, in fact, Ms. Fried is saying, well, he's not really

7  agreeing to that.  One of the rights I will give you is a

8  jury trial on that issue.  And they'll have to prove the

9  loss before a jury on evidence, not what lawyers tell me,

10  but on actual evidence that can be cross-examined, and I'll

11  say to the jury beyond a reasonable doubt is it over $400.

12  Now, I'll give you that.

13         Do you understand that?

14  A   Yes.

15  Q   But she says on your behalf what she and Mr. Heymann

16  agree is that you'll plead guilty today, but when we come to

17  sentencing, we'll leave that number open, but I'm going to

18  decide that number based upon obviously every written thing

19  that's put before me, a presentence report, anything else

20  that I have in writing, and I'll listen to Mr. Heymann's

21  argument, I'll listen to Ms. Fried's argument, I'll listen

22  to whatever you have to say, but then I'll decide it, which

23  means you've given up a jury trial, you've given up proof,

24  because that isn't proof, that's just looking at documents.

25  You've given up cross-examination and you've given up a

1    jury.  I'll do it.

2           She says you are okay with that and so is the

3    government.  Are you okay with that?

4    A   Yes.

5    Q   Very well.  All right.  Now, the only thing then that

6    remains --

7           **THE COURT:**  And that's it, right, the loss figure?

8           **MS. FRIED:**  I think that's it.  I don't think that

9    the other -- yes, that's the one matter.

10          **THE COURT:**  We'll have that in mind.

11   Q   I'm going to ask Mr. Heymann to tell me what he hopes he

12   could put before the jury.  Now, reserving on the loss

13   figure, because we've now talked through how that's going to

14   be figured out if you plead guilty, you listen to what he

15   has to say, because then I'm going to turn to you and say:

16   Is that true?  And if any of it's not true, you tell me,

17   because I'm going to think it is if you tell me it is true.

18          **THE COURT:**  Mr. Heymann, briefly.

19          **MR. HEYMANN:**  Your Honor, may I have just a moment

20   to ask an agent to go to Judge Bowler's courtroom in which

21   I'm due in ten minutes just so that --

22          **THE CLERK:**  I can call.

23          **THE COURT:**  You're not going to talk for ten

24   minutes.

25          **MR. HEYMANN:**  All right.  Your Honor --

1          THE COURT:   Three would be sufficient for us.

2          MR. HEYMANN:   I promise.

3          Your Honor, were this case to go to trial, the

4     evidence would include, as follows.   That Patrick Damon Toey

5     met co-conspirator, Albert Gonzalez, online in approximately

6     1999.   A few years later Gonzalez invited him up to New York

7     where the two used blank plastic cards with magnetic stripes

8     on which fraudulently obtained payment card or debit card

9     and credit card information had been recorded to obtain cash

10    from ATM's.

11         In 2004, Gonzalez asked Mr. Toey whether he would

12    like to sell dumps -- that's stolen track 2 data -- for him,

13    splitting the proceeds.   Track 2 data is data encoded on the

14    magnetic stripes on the backs of credit and debit cards read

15    by ATM machines and credit card readers.   Mr. Toey agreed.

16         From then until 2006, including the period of in or

17    about October 2004 charged in the information to which he is

18    pleading today, Mr. Toey sold dumps for Gonzalez.   Toey

19    typically received payment for the dumps in web-based

20    currency such as E-gold and WebMoney.   At Gonzalez's

21    direction he transferred these payments to Gonzalez's

22    numbered WebMoney currency accounts.   Gonzalez in turn

23    arranged for a portion of the funds to be converted to

24    American dollars available to Mr. Toey.   Some of the money

25    was made available on an ATM card issued by a Latvian bank

1   under an alias.  Other sums of money were simply sent to Mr.

2   Toey by Western Union through a third party web currency

3   conversion service.

4        Moving up now to the fall of 2007, Mr. Toey moved

5   to Miami at the invitation of Gonzalez and lived rent free

6   in a condominium there owned by Gonzalez.  While there, Mr.

7   Toey provided Gonzalez with assistance in performing

8   web-based attacks on companies in order to gain access to

9   their computers and information from which the two could

10  benefit, including dumps.

11       Mr. Toey was successful on a number of occasions in

12  gaining access to computer networks over the Internet.  He

13  would typically pass the information along to Gonzalez who

14  would either continue hacking the networks himself, looking

15  for sensitive financial information, or would pass the

16  information along to another group of hackers for this

17  purpose.

18       By way of example, and it's specifically charged in

19  the information, Mr. Toey found a vulnerability in the

20  computer network operated by specialty clothing retailer

21  Forever 21 and gained access to it.  He passed the means of

22  access along to Gonzalez who worked on it with another

23  hacker to obtain payment card information.  Mr. Toey also

24  set up computer servers for Gonzalez and his

25  co-conspirators.  Two servers utilized by the conspirators

1    for, among other purposes, to store stolen credit and debit

2    card information contained over 40 million distinct credit

3    and debit card numbers.

4            And just to clarify one point.  That figure of over

5    400 million flows from the 40 million credit cards on those

6    servers times the guidelines minimum of $500 per card.

7            **THE COURT:**  All right.

8            **MR. HEYMANN:**  Thank you, your Honor.

9            **THE COURT:**  Thank you.  Excellent, in terms of

10   time.

11   Q    Did you hear what Mr. Heymann had to say?

12   A    Yes.

13   Q    Now, putting aside for the moment the ultimate number

14   for the loss, do you understand those things?

15   A    Yes.

16   Q    Are those things true?

17   A    Yes.

18   Q    So, as I understand it, you're pleading guilty because

19   they've got the goods on you, and maybe more, and you

20   acknowledge that you are guilty of these four crimes.  Is

21   that right?

22   A    Yes.

23           **THE COURT:**  All right, I find that Mr. Damon

24   Patrick Toey knowingly, intelligently and voluntarily

25   exercises his right to plead guilty and the clerk may

1    arraign him now.

2    **Q**   She's going to now do the formal arraignment.  You can

3    plead not guilty or guilty.  If you plead not guilty we'll

4    set it for trial, the plea agreement doesn't count.  If you

5    plead guilty, you're guilty, no taking it back, no starting

6    over.

7          Do you understand?

8    A   Yes.

9          **THE COURT:**  The clerk may arraign Mr. Toey.

10         **THE CLERK:**  Damon Patrick Toey, you have been

11   charged in a four count arraignment with violating 18

12   U.S.C., Section 371, conspiracy, 18 U.S.C., Section 1029,

13   access device fraud, 18 U.S.C., Section 1028A, identity

14   theft, and 18 U.S.C., Section 1030, damage to computer

15   systems.

16         What say you now to Counts 1, 2, 3 and 4, guilty or

17   not guilty?

18         **THE DEFENDANT:**  Guilty.

19         **THE COURT:**  Thank you.  You may step down.

20         (Whereupon the defendant stepped down.)

21         **THE COURT:**  Status of bail?  I've been -- I have a

22   report from our Pretrial Services Department that sets out

23   the conditions of bail.  Have each one of you seen it?

24         **MS. FRIED:**  I haven't quite had a chance to finish

25   reading it, but I think I know pretty much what is

 1    recommended, your Honor.

 2          THE COURT:  Well, what do you say, Mr. Heymann?

 3          MR. HEYMANN:  Your Honor, if I may address the

 4    Court on it.  The concern here is not risk of flight but

 5    rather the risk to the community posed by the defendant who

 6    has a lifelong passion for and a lifelong history of --

 7          THE COURT:  What's your recommendation and then

 8    we'll get the rationale.

 9          MR. HEYMANN:  Okay.  The recommendation is that any

10    computers in the household in which he resides be secured in

11    such a way that he will not have access to them by --

12          THE COURT:  That's one of the conditions.

13          MR. HEYMANN:  Pardon?

14          THE COURT:  No Internet or computer access of any

15    kind.

16          THE PRETRIAL SERVICES OFFICER:  Your Honor, if I

17    may.  I've spoken to the defendant's mother.

18          THE COURT:  Yes.

19          THE PRETRIAL SERVICES OFFICER:  And the computers

20    will be encrypted as I've told the U.S. Attorney.  She was

21    going to call me back and tell me when that could be done.

22    They would have encrypted passwords which the defendant

23    would not have access to.

24          THE COURT:  Well, I want more than that.  No

25    access.  No computers in the household.  They have to get

1   the computers out of the household --

2          **THE PRETRIAL SERVICES OFFICER:**  Yes, your Honor.

3          **THE COURT:**  -- if he's going to be at liberty.

4          **MR. HEYMANN:**  And that he --

5          **THE COURT:**  Are you satisfied with that, Mr.

6   Heymann?

7          **MR. HEYMANN:**  Yes, your Honor.  And that he be put

8   on electronic monitoring to ensure that he is in the

9   household so that he does not go outside to --

10          **THE COURT:**  Again, if you've read this it says

11   that.  I thought you read this.

12          **MR. HEYMANN:**  I am comfortable with it, your Honor.

13   I didn't --

14          **THE COURT:**  All right, fine, that's your

15   recommendation.

16          Ms. Fried, satisfactory?

17          **MS. FRIED:**  Your Honor, I have to -- let me just

18   pose a potential problem.  If there's some reason that my

19   client's family is either unable or unwilling to get all of

20   the computers out of the house then perhaps a place with his

21   mother does not work as a placement and if that --

22          **THE COURT:**  Well, that's the requirement of the

23   Court.

24          **MS. FRIED:**  I understand that.  And what I'm trying

25   to suggest is that if that can't be accomplished we may need

1    to be back here to set some other kind of --

2         THE COURT:  You may, indeed, and we better do it

3    immediately.

4         So he's released on $10,000 unsecured bond.  He's

5    to report to the U.S. Probation Office in the Eastern

6    District of Virginia in Norfolk.  He's placed on electronic

7    monitoring.  And he is allowed to leave the home to seek

8    employment, go to church, medical appointments, and to

9    participate in employment if the probation office of the

10   Eastern District so approves.

11        He's to submit to random drug testing.  He's to

12   participate in in-patient and outpatient drug and mental

13   health treatment and initial evaluation.  He's not to

14   possess any illegal drugs or controlled substances.  No use

15   of alcohol.  His travel is restricted to the Eastern

16   District of Virginia and to the District of Massachusetts,

17   coming to Massachusetts for court purposes only, and of

18   course the states intervening so he can travel back and

19   forth.

20        He's not to have any Internet or computer access of

21   any kind, and there is not to be computer access or Internet

22   in the home.

23        He's not to possess any weapons or dangerous

24   devices.  He's to notify Pretrial Services within 24 hours

25   of any contact with law enforcement.  He's not to violate

1    any federal, state or local laws, and the other statutory

2    conditions.

3            That's the order of the Court.  He's released on

4    those terms.  We'll call the next case.

5            (Whereupon the Court and the Clerk conferred.)

6            **THE COURT:**  Ms. Fried?

7            **MS. FRIED:**  Yes.

8            **THE COURT:**  Take your client down to probation

9    while we get through with this next hearing.

10           **MS. FRIED:**  I will.

11           **THE CLERK:**  Pretrial.

12           **THE COURT:**  Down to pretrial, I'm sorry.

13           **MR. HEYMANN:**  Thank you, your Honor.

14           **THE COURT:**  And remain with him there.  We'll call

15   the next case.

16           (Whereupon the matter concluded.)

17

18

19

20

21

22

23

24

25

1               **C E R T I F I C A T E**

2

3

4          I, Donald E. Womack, Official Court Reporter for

5    the United States District Court for the District of

6    Massachusetts, do hereby certify that the foregoing pages

7    are a true and accurate transcription of my shorthand notes

8    taken in the aforementioned matter to the best of my skill

9    and ability.

10

11

12

13

               /S/ DONALD E. WOMACK 5-5-2010

14            _____
                  DONALD E. WOMACK

15             Official Court Reporter
                  P.O. Box 51062

16        Boston, Massachusetts 02205-1062
                womack@megatran.com

17

18

19

20

21

22

23

24

25